311 Ga. 83
FINAL COPY

S20A1143.  NEUMAN v. THE STATE.

BETHEL, Justice.

In August 2016, a DeKalb County jury found Hemy Neuman guilty of the malice murder of Russell Sneiderman and possession of a firearm during the commission of a felony. This was the second jury to return guilty verdicts against Neuman as to those offenses. We reversed Neuman's convictions following his first trial because the State had improper access to privileged notes and records of Neuman's mental health experts during preparation of the State's case. See *Neuman v. State*, 297 Ga. 501 (773 SE2d 716) (2015).

Neuman now appeals his convictions from his second trial.[1] He

---

[1] Neuman's first trial in 2012 resulted in a guilty but mentally ill verdict on the malice murder count and a guilty verdict on the firearm possession count. Following our remand in 2015, Neuman was retried from August 1 to 23, 2016, and found guilty on both counts. On August 23, 2016, the trial court sentenced Neuman to serve life in prison without parole for the malice murder count and five consecutive years for the firearm possession count. On September 19, 2016, Neuman filed a motion for a new trial, which he subsequently amended twice. Following a hearing, the trial court denied

contends that because the first jury returned a verdict of guilty but mentally ill on the malice murder count,[2] the second jury was collaterally estopped from returning a guilty verdict that did not include a finding of mental illness on that count. Neuman further contends that the District Attorney's Office for the Stone Mountain Judicial Circuit should have been disqualified from representing the State in his second trial because the office had access to the privileged information that resulted in the reversal of his first convictions. He also alleges that the trial court erroneously limited his counsel's examination of two defense witnesses. Finally, Neuman argues that, to the extent his trial counsel did not preserve objections during examination of these witnesses, such failure constituted ineffective assistance of counsel. Seeing no reversible error, we affirm.

---

Neuman's motion on July 31, 2019. Neuman filed a timely notice of appeal on August 29, 2019. This case was docketed to this Court's August 2020 term and was orally argued on September 16, 2020.

[2] In Georgia, juries presented with evidence of a defendant's mental illness may return a verdict of guilty but mentally ill. See OCGA § 17-7-131 (b) (1) (D); see also *Morgan v. State*, 307 Ga. 889, 891 (1) (838 SE2d 878) (2020).

*Sufficiency of the Evidence*

1. Although not raised by Neuman as error in this appeal, as has been our customary practice, we consider the sufficiency of the evidence presented against him at his second trial.[3] The evidence of how the fatal shooting occurred was similar in the two trials. As set forth by this Court in our first review of Neuman's case, this evidence is summarized as follows:

> Shortly after 9:00 a.m. on November 18, 2010, Russell Sneiderman was walking to his car outside of a Dunwoody daycare center after having just dropped off his son, when Neuman approached and shot him four [or] five times in the neck and torso. Sneiderman was pronounced dead approximately an hour later.
>
> Neuman does not dispute that he planned and perpetrated Sneiderman's murder. He admitted [to police and psychologists that] he had an affair with Sneiderman's wife, planned Sneiderman's murder, purchased a disguise and a gun, rented a car, shot Sneiderman, threw the gun in a lake, disposed of the disguise, asked the person from whom he had purchased the gun to lie to the police, and lied to the police himself. Additionally, witnesses from the scene at the daycare identified Neuman as the shooter during trial. Ballistic

---

[3] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that began in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

evidence showed that the bullets that killed Sneiderman matched the gun Neuman had purchased.

*Neuman*, 297 Ga. at 501-502 (1).

The key issue during both trials involved evidence of Neuman's mental condition at the time of the shooting. To support Neuman's plea of not guilty by reason of insanity, Neuman engaged the services of psychologist Dr. Andrea Flores. In the second trial, Dr. Flores testified (largely as she did in the first trial) that Neuman suffered from bipolar disorder with psychosis. Dr. Flores opined that Neuman experienced delusions, which made him believe he needed to kill Sneiderman in order to protect Sneiderman's children from harm by their father. She testified that the delusions also compelled Neuman to lie to the police and make efforts to conceal his identity so that Sneiderman's wife would not know how Neuman killed her husband. Dr. Flores testified that she formed her professional opinions following an extensive review of Neuman's medical records, review of documents and correspondence from Neuman, interviews with Neuman and others, and a review of tests administered to

4

Neuman by other professionals. As she did at the first trial, Dr. Flores testified about her qualifications and the extent of her investigation and findings in regard to Neuman's mental health.

As in the first trial, to counter Dr. Flores's testimony, "the State presented testimony from numerous friends, family members, and co-workers of Neuman who stated that they had never witnessed any symptoms or behaviors consistent with mental illness involving manic episodes, delusional thinking, or hallucinations." *Neuman*, 297 Ga. at 502 (1). Additionally, for the second trial, forensic psychologist Dr. Don Hughey and forensic psychiatrist Dr. Joseph Browning were engaged by the State to evaluate Neuman's ability to distinguish right from wrong at the time of the crimes and whether Neuman was acting under a delusional compulsion when he killed Sneiderman. During these evaluations, Neuman admitted killing Sneiderman. Both State experts testified that there was no evidence that Neuman suffered from a major mental health disorder or was delusional on the day of the shooting and explained to the jury that Neuman's actions showed that he could distinguish

5

between right and wrong. Both experts also testified that Neuman showed signs of malingering[4] during evaluations and was not suffering from any mental illness. Both testified that Neuman's hyper-sexuality, the elaborate nature of the shooting, the efforts Neuman made to cover it up, and the inconsistent manner in which Neuman described his delusions made it clear that Neuman was not suffering from any mental delusions at the time of the shooting.

At the second trial, the State also presented a recording of a jail phone call between Neuman and his sister that occurred on August 4, 2016, during the first trial. In the recording, Neuman expressed a preference for being found not guilty by reason of insanity because he would prefer to stay in a mental health facility instead of a prison.

As with the evidence presented during Neuman's first trial, we conclude that the evidence presented during his second trial and

---

[4] As defined by Dr. Hughey at trial, "[m]alingering is the deliberate fabrication or exaggeration of psychiatric or physical symptoms of the person for secondary gain. Secondary gain could be something like evading criminal prosecutions, or in a civil litigation, to obtain disability without just cause."

summarized above was sufficient to authorize a rational trier of fact to find Neuman guilty of malice murder and possession of a firearm during the commission of a felony. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979); *Neuman*, 297 Ga. at 502 (1). The jury was likewise authorized to reject Neuman's insanity defense and find no mental illness based on its assessment of the credibility of the witnesses and of any conflicts in the evidence. See id.; see also *Choisnet v. State*, 295 Ga. 568, 571 (1) (761 SE2d 322) (2014); *Durrence v. State*, 287 Ga. 213, 217 (1) (b) (695 SE2d 227) (2010).

## *Collateral Estoppel*

2. At Neuman's first trial, the jury rejected his insanity defense and found him "guilty but mentally ill" of malice murder. See *Neuman*, 297 Ga. at 501 n.1. At Neuman's second trial, the jury found him guilty of malice murder with no finding of mental illness. Neuman urges this Court to determine that the second jury was collaterally estopped from finding him guilty with no finding of mental illness on the malice murder count because the first jury

7

found that he suffered from mental illness. We agree with the State, however, that this claim was not preserved for appellate review.

The Fifth Amendment to the United States Constitution guarantees criminal defendants protection against double jeopardy. U. S. Const. Amend. V. The Fifth Amendment's bar against double jeopardy encompasses the doctrine of collateral estoppel, which precludes the re-litigation of an ultimate fact issue that was determined by a valid and final judgment. See *Giddens v. State*, 299 Ga. 109, 112-113 (2) (a) (786 SE2d 659) (2016).[5]

Following his first trial, Neuman appealed from his convictions on the malice murder and firearms possession counts, which resulted in this Court reversing both of his convictions based on trial court error. See *Neuman*, 297 Ga. at 510 (2). He was then retried on those same counts. Neuman did not file a plea in bar prior to the second trial, nor did he raise the alleged collateral estoppel claim in

---

[5] Neuman has not argued in this appeal that the jury's verdict on the malice murder charge in the second trial was barred by the Double Jeopardy Clause of the Georgia Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Par. XVIII. Thus, we limit our review of his claim to whether the verdict was barred by the Fifth Amendment to the United States Constitution.

8

any other way at any time during the trial.

The doctrine of double jeopardy has two components: the "procedural" bar on double jeopardy, which places limitations on "multiple prosecutions for crimes arising from the same conduct," and the "substantive" bar, which protects against "multiple convictions or punishments" for such crimes. *Stephens v. Hopper*, 241 Ga. 596, 598-599 (1) (247 SE2d 92) (1978); see also *Carman v. State*, 304 Ga. 21, 26 (2) n.3 (815 SE2d 860) (2018); *Keener v. State*, 238 Ga. 7, 8 (230 SE2d 846) (1976). Here, it is clear that Neuman's retrial on the same charges entailed a successive prosecution. Accordingly, any resulting double jeopardy claim was procedural in nature. By failing to file a plea in bar or otherwise contest the initiation of the second trial on the basis of former jeopardy, Neuman did not preserve this question for our review, and this enumeration fails. See *McCormick v. Gearinger*, 253 Ga. 531, 533 (3) (322 SE2d 716) (1984) ("[Defendant's] failure to file a written plea in bar before his second trial operates as a waiver of his subsequent challenge on double jeopardy grounds." (citations omitted)); see also *Prince v.*

*State*, 299 Ga. App. 164, 171 (4) (682 SE2d 180) (2009) (holding that failure to file a plea in bar waives appellate review of collateral estoppel claim); *Collins v. State*, 266 Ga. App. 871, 874-875 (2) n.10 (601 SE2d 111) (2004) (claim based on procedural double jeopardy was not preserved for appeal because no plea in bar was filed).

*Disqualification of District Attorney*

3. Neuman next argues that the District Attorney's Office for the Stone Mountain Judicial Circuit should have been disqualified from representing the State in his second trial because it had improper access to privileged mental health records, which he argues created a conflict of interest and an appearance of impropriety. For reasons discussed below, we disagree.

Prior to his first trial, Neuman's counsel hired Dr. Peter Thomas, a licensed psychologist, and Dr. Julie Rand Dorney, a forensic psychologist, to evaluate Neuman for any psychological issues to assess the viability of an insanity defense. See *Neuman*, 297 Ga. at 502-503 (2). Upon learning that both Dr. Dorney and Dr. Thomas had met with Neuman, the State sought the doctors'

10

records. See id. at 503 (2). The trial court conducted an in camera review of the records and ultimately provided the State with the doctors' notes and records. See id. The records that were disclosed to the State included notes from both psychologists of their impressions of Neuman after several hours of in-person evaluations and their notes on Neuman's own self-reports. See id. Notably, the prosecutors quoted from the doctors' notes during closing arguments in the first trial to support the State's theory that Neuman was malingering. See id. at 509 (2). On appeal, we held that the trial court erred in disclosing these records to the State because they were protected by the attorney-client privilege. See id. at 508 (2). We also determined that the error was not harmless and reversed Neuman's convictions. See id. at 509-510 (2).

Prior to Neuman's second trial, the State announced that Neuman would be tried by the same two assistant district attorneys who had prosecuted Neuman during his first trial. In response, Neuman filed a motion to disqualify the entire office of the District Attorney for the Stone Mountain Judicial Circuit from participating

in the retrial. Neuman noted that the prosecutors were in possession of and had read the information this Court deemed protected by attorney-client privilege and should be disqualified from participating at the retrial. At the hearing on the motion, Neuman argued that the prosecutors' possession of this information affected their preparation of his case, creating a disqualifying interest or relationship under OCGA § 15-18-5 (a).[6] In response, the State argued that this situation did not constitute a disqualifying interest or relationship and that the remedy for the State's possession and use of privileged information was not disqualification, but rather complete exclusion of the improper evidence from the second trial. The trial court agreed with the State, denied Neuman's motion to disqualify, and allowed the two assistant district attorneys to

---

[6] Neuman argues that OCGA § 15-18-5 (a) establishes that a district attorney may be disqualified by motion of the defendant due to an "interest or relationship." But that is incorrect. OCGA § 15-18-5 (a), instead, provides the procedure that the Attorney General follows to designate or appoint another prosecuting attorney to handle a prosecution "[w]hen a district attorney's office is disqualified from interest or relationship." Put another way, OCGA § 15-18-5 (a) is not the source of a test for disqualification. Rather, it is a procedure used to address a disqualification. The grounds for disqualification come from other sources of law.

represent the State again at the second trial. Their representation, however, was subject to strict limitations on the use of the privileged material, including excluding the privileged information from evidence, hiring new experts with no access to the privileged information, erecting an "ethical screen" within their office, and destroying all copies of the privileged information.

We review the trial court's ruling on a motion to disqualify a prosecutor for abuse of discretion. See *Amusement Sales v. State of Ga.*, 316 Ga. App. 727, 735 (2) (730 SE2d 430) (2012). "Such an exercise of discretion is based on the trial court's findings of fact which we must sustain if there is any evidence to support them." (Citation and punctuation omitted.) *Ventura v. State*, 346 Ga. App. 309, 310 (2) (816 SE2d 151) (2018).

Neuman argues that disqualification of the district attorney's office from the second trial was the only proper remedy for the State's receipt of the privileged information. To support this position, Neuman cites two cases from other states: *State ex rel. Winkler v. Goldman*, 485 SW3d 783, 790-791 (Mo. Ct. App. 2016)

13

(holding that the prosecutor should be disqualified from the case due to bad faith conduct in receipt of privileged information), and *State v. Mark Marks P.A.*, 758 S2d 1131, 1137 (Fla. Dist. Ct. App. 2000) (affirming disqualification of prosecutor's office after it received extensive, "unfettered access" to over 250 confidential case files held by defendant's attorney). But we do not view either of these cases as persuasive in the situation before us.

Disqualification of the prosecuting attorneys might be appropriate in a case like *Marks*, where the privileged information disclosed to the prosecution was so voluminous that it would cast doubt on the fairness of the trial absent disqualification of the prosecuting attorneys who had reviewed the files. In this case, however, the disclosed information was relatively limited. The privileged information provided to the prosecutors in this case consisted only of notes and records from experts who were not called as witnesses in the second trial. And, per the order of the trial court, the prosecutors here were barred from making any use of those notes in the second trial. Further, unlike the situation in *Winkler*, the

14

record in this case does not indicate any evidence of bad faith conduct on the part of the prosecuting attorneys or the District Attorney's office, and Neuman conceded at oral argument before this Court that the State did not engage in *any* misconduct in obtaining the privileged information.

Instead of disqualifying individual prosecutors or a district attorney's entire office, the trial court denied the State the benefit of the privileged evidence at trial and provided the appropriate remedy for a situation like this. See, e.g., *Inman v. State*, 294 Ga. 650 (755 SE2d 752) (2014) (after the State received information protected by the attorney-client privilege, there was no harm from such disclosure and disqualification of the prosecutor was not required because the State agreed not to present any of the privileged information). Therefore, we see no abuse of the trial court's discretion in its decision to deny the motion to disqualify.

Moreover, the record shows that the trial court also took other reasonable steps before Neuman's second trial to prohibit the prosecutors from relying on the information, and it specifically found

that the prosecutors had no unfair advantage in the second trial based on it. During the hearing on Neuman's motion for new trial, the prosecutors represented to the trial court that, as ordered by the court before the second trial, they had not used the information in their preparation for the second trial and that they had erected an "ethical screen" by hiring new experts, destroying all copies of the documents, and not discussing or otherwise communicating about the privileged information with each other or anyone in the office of the District Attorney. Because the trial court was best positioned to judge the credibility of the prosecutors' statements, we cannot say that the trial court erred in relying on these assurances regarding the additional procedures the State followed to prevent use of the privileged information. Finally, the same judge presided over both trials. As with the question of the prosecutors' credibility, the trial court was in the best position to determine whether access to the privileged information infected or tainted the second trial. The trial court determined that it did not, and we see no abuse of discretion in that determination. See *Inman*, 294 Ga. at 653 (2) (a) (no harm

16

where there is no evidence that the State used — at trial or otherwise — the privileged information it was provided).

For these reasons, we see no abuse of discretion in the trial court's denial of Neuman's motion to disqualify the prosecutors who represented the State in Neuman's trials. Further, because Neuman has not demonstrated a basis for disqualification of the specific prosecutors who handled his case, it follows that disqualification was not warranted as to the office of the District Attorney as a whole. This enumeration fails.

*State Objections to Defense Witness Testimony*

4. Neuman complains of numerous alleged errors connected to the testimony of Neuman's sister, Monique Matsch, and Dr. Adriana Flores, a psychologist who examined Neuman. For reasons discussed below, we identify no reversible error in the trial court's management of the defense's examination of these two witnesses.

(a) *Objections during the Testimony of Monique Matsch.*

With regard to Matsch's testimony, Neuman contends that the trial court abused its discretion by excluding relevant evidence in

17

response to objections by the State and that the trial court did not provide Neuman's counsel an opportunity to respond to the State's objections. We disagree with both contentions.

(i) Neuman first argues that the trial court erred by sustaining the State's relevance objections to Matsch's testimony regarding Neuman's family history as Holocaust survivors, his childhood, and his personal behavior around the time of the crimes. Neuman claims that Matsch's testimony on these points was either relevant to his defense or would have rebutted testimony of State witnesses.

Under OCGA § 24-4-401 ("Rule 401"), "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-402 provides that, generally, "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules[.]" For example, even "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

18

confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403.

> We review a trial court's evidentiary rulings under an abuse of discretion standard of review. And even where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a substantial right, and thus harm, the defendant.

(Citations and punctuation omitted.) *Venturino v. State*, 306 Ga. 391, 393 (2) (830 SE2d 110) (2019). A trial court error that does not implicate a constitutional right is harmless if the State shows that it is "highly probable that the error did not contribute to the verdict," an inquiry that involves consideration of the other evidence heard by the jury. *Bozzie v. State*, 302 Ga. 704, 708 (808 SE2d 671) (2017); see also *Williams v. State*, 302 Ga. 147, 153-155 (3) (805 SE2d 873) (2017); OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and

19

punctuation omitted.) *Kirby v. State*, 304 Ga. 472, 478 (3) (c) (819 SE2d 468) (2018).

In evaluating whether the trial court's management of Matsch's testimony included an abuse of discretion, it is helpful to consider some of the testimony Matsch gave during her extended time on the witness stand. Among other things, Matsch testified that Neuman had a bad childhood, which included physical and verbal abuse from his father. Matsch testified that Neuman's father drank alcohol irresponsibly and that Neuman bore the brunt of his father's abuse in the home and acted to protect his sister from their father's abuse. Matsch recounted a particular incident of abuse that featured their father knocking a bowl of ice cream from Neuman's hands as he initiated an abusive assault. Matsch also described a strained relationship between Neuman's parents that included multiple periods of separation during Neuman's childhood. With respect to another childhood relationship and experience, Matsch recounted an incident in which Neuman acted to create a distraction or diversion that interrupted an attempted sexual assault on Matsch

20

by her cousin. With respect to Neuman's behavior later in life, Matsch relayed details of a prolonged period during a summer while Neuman was a college student when he was withdrawn and lethargic. She also relayed stories about interactions with Neuman, his wife, and children when Neuman was an adult. Matsch also provided testimony concerning what she perceived as an unusual e-mail communication she received from Neuman as well as her perception of Neuman's unusual demeanor while attending a family funeral in 2010.

In the context of Matsch's entire testimony, the trial court's rulings on the State's relevance objections did not improperly prohibit the defense from exploring Matsch's view of the siblings' shared childhood being raised by Holocaust survivors, the abuse of Neuman witnessed by Matsch, specific behaviors witnessed by Matsch, or even Matsch's perception of Neuman's demeanor and behavior. By granting the State's relevance objections, the trial court acted to keep Matsch's testimony focused on the questions asked by counsel, limited to Matsch's personal knowledge, and

relevant to the issues being tried. Even with the minor limitations imposed by the trial court, Neuman was allowed an extensive and wide-ranging examination of Matsch.

But, even assuming that the trial court erred in some regard by sustaining some of the State's relevance objections and limiting Matsch's testimony, all of the additional evidence Neuman suggests should have been admitted was presented to the jury during the testimony of Dr. Adriana Flores, the defense's expert psychologist who examined Neuman. Dr. Flores testified on these topics based on information she collected during interviews with Neuman and others. Accordingly, we determine that even if the trial court abused its discretion to some extent by excluding Matsch's testimony on these issues on relevance grounds, such error was harmless because the testimony excluded by the trial court on the State's objections was duplicative of other portions of Matsch's own testimony and the testimony of Dr. Flores. It is therefore highly probable that the verdicts would have been the same had all of Matsch's testimony been admitted over the State's relevance objections. See *Foster v.*

*State*, 272 Ga. 69, 71 (6) (525 SE2d 78) (2000) (excluded testimony was cumulative of other expert witness's direct testimony such that any error in its exclusion was harmless).

(ii) Neuman also claims that the trial court erred by sustaining the State's objection that Matsch's statements of opinion about Neuman's behavior were non-responsive to questions asked by defense counsel. Specifically, Neuman's counsel asked Matsch whether she recalled a time when Neuman had protected Matsch from their cousin; Matsch said that she did. Matsch was then asked what Neuman did to protect her, and she began to describe years of abuse she had suffered at the hands of their cousin. The State objected to these statements as being non-responsive, and the trial court sustained the objection.

Neuman argues that Matsch was merely beginning to answer the question and providing context for her answer and that the trial court erred by limiting her response. However, in this instance, we see no abuse of the trial court's discretion in its determination that Matsch's answer was unresponsive to the specific question asked,

23

and Neuman never made additional efforts to have Matsch answer the question directly. Because OCGA § 24-6-611 (a) (2) provides the trial court with broad discretion to exercise "reasonable control" over the presentation of witnesses and evidence "to avoid needless consumption of time[,]" we see no abuse of discretion in the trial court's decision to sustain this objection by the State. See *Rickman v. State*, 304 Ga. 61, 64 (2) (816 SE2d 4) (2018).

(iii) As to the remaining objections made by the State during Matsch's testimony that were sustained by the trial court and of which Neuman now complains, Neuman argues that the trial court sustained these objections without providing the basis for sustaining them and failed to provide the defense an opportunity to respond to the objection before ruling. However, the record shows several instances in which the trial court offered reasons for sustaining the objections that Neuman claims were not provided. Further, nothing in the record supports the allegation that Neuman was not provided an opportunity to respond to these objections. In each such instance, Neuman's counsel simply proceeded to a different line of questioning

24

without responding to the State's objection or to the trial court's ruling on the record. Neuman has objected to these rulings only on the basis that his counsel was not afforded an opportunity to respond to the trial court's rulings and has not offered this Court any argument for why we should determine that the trial court's rulings on these objections constituted an abuse of discretion. Having failed to carry his burden of demonstrating error, Neuman's enumerations of error regarding the trial court's handling of these objections fail.

(b) *Objections during the Testimony of Dr. Adriana Flores.*

Neuman also argues that the trial court erred by sustaining numerous objections made by the State during the direct testimony of Dr. Flores and during Dr. Flores's surrebuttal testimony.

(i) Neuman first claims that the trial court erred by limiting Dr. Flores's testimony while Neuman's counsel was qualifying Dr. Flores as an expert witness. Neuman vaguely argues that testimony about the details of the assessment protocol for patients in a hospital unit where Dr. Flores previously worked was relevant under Rule

25

401 to qualify Dr. Flores as an expert in the field of psychology. We disagree.

First, the specific assessment protocols used in Dr. Flores's previous employment seem to have little bearing on her qualification as an expert. Despite excluding testimony about those protocols, the trial court accepted Dr. Flores as an expert for the defense. Moreover, the trial court did not expressly limit this testimony or indicate that Neuman was prohibited from revisiting the subject. Instead, the record shows that the trial court merely granted the State's relevance objection to a question about protocols utilized in her previous role and authorized Neuman's counsel to rephrase a question about these protocols during Dr. Flores's voir dire. The record shows that Neuman's counsel declined to do so. For these reasons, we see no abuse of the trial court's discretion in its ruling on this objection.

(ii) Neuman also claims that the trial court erred by refusing to allow Dr. Flores to testify in response to questions about Neuman's statements regarding his family's history of mental

26

illness and actions and statements of the victim's wife, Andrea Sneiderman, leading up to the shooting. Neuman argues that the statements were admissible under the hearsay exception contained in OCGA § 24-8-803 (4) because they were made for the purposes of medical diagnosis or treatment, and under OCGA § 24-7-703 because Dr. Flores relied on those statements in concluding that Neuman suffered from severe mental illness and was not malingering. We conclude that Neuman has failed to demonstrate reversible error.

During the defense's case-in-chief, Dr. Flores discussed her evaluation and her diagnosis of Neuman's bipolar disorder. At one point during the trial, the court refused to allow Dr. Flores to discuss third-party statements about Neuman's medical and psychological history from Neuman's colleagues, family, and friends that she had interviewed, and what she had learned about Andrea Sneiderman's actions and statements. However, the trial court repeatedly clarified that Dr. Flores could testify about what Neuman told her regarding both of these subjects.

27

Even if we assume that the trial court abused its discretion by limiting Dr. Flores's testimony about these subjects, such error was harmless because the excluded testimony was cumulative of other admitted evidence. First, when the State's objection was sustained regarding the statements made by third parties to Dr. Flores, Dr. Flores had *already* testified about the contents of the statements made by those she interviewed concerning Neuman's mental health history. Second, after Dr. Flores was limited from discussing Neuman's family mental health history during her direct examination, Neuman's counsel re-asked these questions during Dr. Flores's surrebuttal testimony and was able to elicit this testimony without objection from the State. The people that Dr. Flores interviewed about Neuman also testified at trial, and their testimony largely tracked what they had told Dr. Flores during their interviews. Finally, Dr. Flores also described Andrea Sneiderman's actions and statements without objection during her surrebuttal testimony. Accordingly, Neuman has failed to demonstrate how the specific testimony sought from Dr. Flores would have changed the

outcome of the trial if it had been given at the time of the sustained objections. See *Shealey v. State*, 308 Ga. 847, 853-854 (2) (b) (843 SE2d 864) (2020) (erroneous exclusion of evidence was harmless because excluded evidence was cumulative of other evidence admitted at trial); *Reaves v. State*, 292 Ga. 545, 548 (2) (d) (739 SE2d 368) (2013) (same).

We note that Neuman has also represented that, had the trial court overruled such objections in the second trial, Dr. Flores would have testified in the second trial precisely as she did in the first trial. Given the overwhelming evidence from numerous witnesses — including expert witnesses and Neuman's family, colleagues, and friends — that Neuman displayed no signs of mental illness and was malingering, we see no reasonable probability that the second trial's outcome would have differed had Dr. Flores's testimony been presented exactly as it was in the first trial. See *Walker v. State*, 306 Ga. 44, 47 (2) (829 SE2d 121) (2019) (any error in excluding evidence was harmless because such evidence was cumulative of other evidence presented as to appellant's defense at trial); see also *Harris*

*v. State*, 256 Ga. 350, 377 (3) (349 SE2d 374) (1986) (court's assumed error in handling of expert testimony was harmless because of overwhelming evidence of defendant's guilt and against his defense of insanity).

(iii) Neuman further claims that the trial court erred by excluding as irrelevant Dr. Flores's testimony about the housing protocol in correctional facilities for individuals found not guilty by reason of insanity,[7] about whether Dr. Flores thought Andrea Sneiderman's actions in sending Neuman pictures were appropriate, about Neuman's statements to Dr. Flores about how Neuman felt about Andrea Sneiderman prior to the shooting, and about whether Dr. Flores had any concerns that Neuman could be malingering. Neuman argues that such evidence was relevant under Rule 401.

First, we note that a review of the nearly two trial days' worth of Dr. Flores's testimony reveals that she did testify, to some extent,

---

[7] These are the same sort of protocols that formed the basis of the State's objection during the voir dire of Dr. Flores discussed above in Division 4 (b) (i).

30

about each of these issues during her direct testimony and later during her surrebuttal testimony without objection by the State. Additionally, the record shows that when the trial court granted the State's objections, it regularly suggested that Neuman's counsel could rephrase the question, and the court consistently allowed counsel to revisit lines of questioning. Further, as with the objections above, even assuming trial court error with regard to the specific objections, we find no reasonable probability that any error in the trial court's exclusion of the statements at issue contributed to the verdicts, especially considering the exhaustive testimony Dr. Flores did provide and the overwhelming evidence that Neuman was malingering. Thus, any error in this regard was harmless. See *Kirby*, 304 Ga. at 478; see also *Walker*, 306 Ga. at 47 (2).

(iv) As to the State's remaining objections during the defense's examination of Dr. Flores, Neuman provides neither argument nor citation of authority as to why it was error for the trial court to sustain such objections or how Neuman was harmed by such alleged errors. It is not the function of this Court to cull the record for a

party to find alleged errors or to form arguments on the appellant's behalf. See *Henderson v. State*, 304 Ga. 733, 739 (2) (e) (822 SE2d 228) (2018); *Roberson v. State*, 300 Ga. 632, 636 (III) (797 SE2d 104) (2017) ("It is well established that the burden is on the party alleging error to show it by the record[.]" (citation and punctuation omitted)). This Court's Rule 22 provides that "[a]ny enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned. . . ." We deem these portions of Neuman's claim of error to be abandoned.

*Ineffective Assistance of Counsel*

5. With respect to the objections discussed in Divisions 4 (a) (iii) and (b) (iv) above, Neuman contends that his trial counsel provided constitutionally ineffective assistance by failing to respond to these objections by the State. We disagree.

To succeed on his claims, Neuman must show that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient

performance, Neuman must prove that his lawyer "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Thornton v. State*, 307 Ga. 121, 126 (3) (834 SE2d 814) (2019). Further, "[t]o establish prejudice, [Neuman] must prove that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." Id. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter,* 562 U. S. 86, 104 (IV) (131 SCt 770, 178 LE2d 624) (2011) (quoting *Strickland,* 466 U. S. at 693 (III) (B)). Rather, Neuman must establish a "reasonable probability" of a different result, which means "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U. S. at 694 (III) (B). We need not address both components of this test if Neuman has not proved one of them. See *Walker v. State*, 301 Ga. 482, 489 (4) (801 SE2d 804) (2017).

*Strickland* places a heavy burden on the defendant to "affirmatively prove" prejudice. *Pierce v. State*, 286 Ga. 194, 198 (4)

(686 SE2d 656) (2009). Even assuming that trial counsel's failure to respond to the State's objections constituted deficient performance, Neuman has not shown — or even argued — how the failure by trial counsel to respond to the objections individually or cumulatively prejudiced him. He has thus failed to demonstrate that there is a reasonable probability the trial would have had a different outcome had counsel provided responses to the State's objections. Because Neuman has not satisfied his burden of demonstrating prejudice, his claim of ineffective assistance of counsel fails. [8]

*Judgment affirmed. All the Justices concur.*

---

[8] Neuman makes no argument that all the errors we assume today, though individually harmless, nevertheless harmed him when aggregated. And no such cumulative prejudice is apparent to us on this record. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("(A) defendant who wishes to take advantage of the (cumulative error rule) should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors." (punctuation omitted)); *Armstrong v. State*, 310 Ga. 598 (5) n.13 (852 SE2d 824) (2020).

Decided March 15, 2021.

Murder. DeKalb Superior Court. Before Judge Adams.

*Michael W. Tarleton, Veronica M. O'Grady*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Anna G. Cross, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.